# JAMES W. CLYDE and others, Respondents, v. JOHN J. CUMMINGS and others, Appellants.

### No. 2001.   Decided March 27, 1909 (101 Pac. 106).

1. PUBLIC LANDS—REGULATIONS—POWERS OF SECRETARY OF INTERIOR. Congress may authorize the Secretary of the Interior to make rules and regulations for the carrying into effect of the provisions of a law as to the public lands, the enforcement of which devolves on his department.   (Page 465.)

2. PUBLIC LANDS—REGULATIONS—POWER OF SECRETARY OF INTERIOR. A rule by the Secretary of the Interior, the import of which is to carry into effect the provisions of an act relating to the public lands, is valid, and has the same binding force as the law itself.   (Page 465.)

3. PUBLIC LANDS—LEASES. The Secretary of the Interior has no authority under his general power of supervision and control of the public domain to lease any part of it, unless authorized to do so by an act of Congress.   (Page 466.)

4. PUBLIC LANDS—IRRIGATION—LEASE OF LANDS RESERVED. Reclamation Act (Act Cong. June 17, 1902, c. 1093, 32 Stat. 388 [U. S. Comp. St. Supp. 1907, p. 511]), providing for the construction and maintenance of irrigation works for the storage, etc., of waters for the reclamation of arid lands, authorized the Secretary of the Interior to withdraw from public entry lands required for irrigation works contemplated by the act. Section 10 empowers him to perform any acts and to make such rules and regulations as may be necessary to carry out the provisions of the act. *Held*, that the Secretary may establish rules regulating the use of the withdrawn lands while not needed for the purpose for which they are reserved, and may lease them for grazing and limit the number of animals to be grazed thereon; the revenue derived from the leases going into the reclamation fund provided by the act.   (Page 467.)

APPEAL from the Fourth District Court, Wasatch County. —*Hon. J. E. Booth,* Judge.

Action to recover a certain sum for grazing privileges which it is alleged were enjoyed by defendants upon lands leased by plaintiffs from United States Government. From a judgment for the plaintiffs, the defendants appealed.

AFFIRMED.

*Messrs. King & Burton* for appellants.

*A. C. Hatch* for respondents.

STATEMENT OF FACTS.

Plaintiffs brought this action to recover from defendants the sum of $1,164.75 for certain grazing privileges which they claim were enjoyed by defendants upon certain lands leased by plaintiffs from the United States government for grazing purposes. The case was tried to a jury, and a verdict for $711.60 was rendered in favor of plaintiffs. From the judgment entered on the verdict, defendants have appealed to this court.

The lands in question are situate in Wasatch county, this state, and comprise the site of the Strawberry Valley reservoir, and drainage basin, and were withdrawn from public entry by an order of the Secretary of the Interior dated March 13th, 1907. This order was made and promulgated under and in pursuance of an act of Congress known as the "Reclamation Act" (Act June 17th, 1902, c. 1093, 32 Stat. 388 [U. S. Comp. St. Supp. 1907, p. 511]). The act, among other things, provides as follows:

"Sec. 2. The Secretary of the Interior is hereby authorized and directed to make examinations and surveys for, and to locate and construct, as herein provided, irrigation works for the storage, diversion and development of waters. . . .

"Sec. 3. The Secretary of the Interior shall, before giving the public notice provided in section 4 of this act, withdraw from public entry the lands required for any irrigation works contemplated under the provisions of this act, and shall restore to public entry any of the lands so withdrawn when, in his judgment, such lands are not required for the purposes of this act; and the Secretary of the Interior is hereby authorized, at or immediately prior to the time of beginning the surveys for any contemplated irrigation works, to withdraw from entry, except under the homestead laws, any public lands believed to be susceptible of irrigation from said works:

Provided, that all lands entered and entries made under the homestead laws within areas so withdrawn during such withdrawal shall be subject to all the provisions, limitations, charges, terms, and conditions of this act; that said surveys shall be prosecuted diligently to completion, and upon the completion thereof, and of the necessary maps, plans and estimates of cost, the Secretary of the Interior shall determine whether or not said project is practicable and advisable, and if determined to be impracticable or inadvisable, he shall thereupon restore said lands to entry. . . .

"Sec. 4. That upon the determination of the Secretary of the Interior that any irrigation project is practicable, he may cause to be let contracts for the construction of the same. . . .

"Sec. 10. That the Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this act into full force and effect."

The secretary made an order bearing date of March 14th, 1906, authorizing the leasing for temporary use of lands withdrawn from public entry under the foregoing provisions of the reclamation act, until such lands should be needed for the irrigation project for which the withdrawal was made. In compliance with this order, the officers of the reclamation service who were in charge of the work known as the "Strawberry Valley Project" gave notice that sealed proposals for grazing privileges upon the lands in question from June 1st, until December 31st, 1907, would be received at the office of the reclamation service at Provo, Utah. In pursuance of the notice thus given both plaintiffs and defendants sent in sealed proposals for the exclusive privilege of grazing sheep and cattle upon the lands mentioned for the time specified in the notice. Plaintiffs' bid was $10,408, and that of defendants was a little in excess of $5,000. Plaintiffs' bid was accepted, and a written lease, specifying the terms and conditions under which the grazing privileges should be exercised, and limiting the number of sheep to be grazed at any one time upon the lands therein mentioned, was duly signed by the plaintiffs and by J. L. Lytel, the engineer of the United States Reclamation Service, acting for the United States government.

It appears from the record that the major part of the lands in question was formerly a part of the Uintah Indian reservation, and immediately after the reservation was thrown open to public entry these lands were, under the reclamation act, withdrawn from entry. The record further shows that defendants leased a part of these lands for grazing purposes in 1905, and that they also leased other lands in that vicinity from 1900 to 1907. They were therefore advised of the rules and regulations under which the lands were leased, and, as stated, they bid for the exclusive privilege of grazing the lands in 1907. After this privilege was awarded to the plaintiffs, and before the lease was finally executed, the plaintiffs and other parties, including defendants, having sheep on these lands, met with the government officials in charge of the irrigation project mentioned at Provo, Utah, to determine upon the price that should be paid to the lessees by defendants and other persons not parties to the lease for grazing privileges on the leased lands, and at that meeting it was decided that fifteen cents per head should be paid for sheep grazed thereon during the month of June, 1907. Defendants, according to their own testimony, made no objection to the price there decided upon, nor did they raise any question as to the validity of the lease, and their evidence tends to show that they tacitly, if not expressly, gave plaintiffs to understand that they were willing to pay and would pay ten cents per head for grazing their sheep on the lands in question during the month of June, 1907. The defendants admit in their answer that John J. Cummings and John G. Cummings, two of the defendants, grazed 6,550 head of sheep upon said lands during the month of June, 1907. Plaintiffs demanded payment of the defendants for the grazing privileges enjoyed by them upon the lands in question, which they claimed were reasonably worth $1,164.75, but defendants refused to pay the same, or any part thereof; hence this suit.

McCARTY, J. (after stating the facts as above):

The important question involved in this case, and the only one we deem of sufficient importance to warrant discussion, is: Did the Secretary of the Interior, in making the order or rule authorizing the temporary leasing of the lands withdrawn from public entry under the provisions of the reclamation act, exceed his authority?

It is strenuously insisted by counsel for defendants that the act neither expressly nor by implication authorizes the making of any such rule or order, and that the leasing of the lands in question was without authority of law and therefore void. That Congress may authorize an executive officer to make rules and regulations for the carrying into effect of the provisions of a law, the enforcement of which devolves upon the particular branch of the executive department to which such officer belongs, is too well settled to admit of serious discussion. (*United States v. Eaton,* 144 U. S. 677, 12 Sup. Ct. 764, 36 L. Ed. 591; *Field v. Clark,* 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294; *Caha v. United States,* 152 U. S. 211, 14 Sup. Ct. 513, 38 L. Ed. 415; *United States v. Dastervignes* [C. C.], 118 Fed. 199; *United States v. Shannon* [C. C.], 151 Fed. 863; *United States v. Domingo* [D. C.], 152 Fed. 566; *In re Kollock,* 165 U. S. 526, 17 Sup. Ct. 444, 41 L. Ed. 813; *Dastervignes v. United States,* 122 Fed. 30, 58 C. C. A. 346.) The validity of a rule of this kind usually depends upon the question as to whether the rule itself is an attempt to create a law, or is only a regulation or means of enforcing a law already in existence. If the rule amounts to nothing more than a regulation, the purport and tendency of which is to carry into full force and effect the provisions of the act to which it refers, it is valid and has the same binding force as the law itself. In the case of *Railroad Co. v. Commissioners of Clinton County,* 1 Ohio St. 77, the rule is tersely and correctly stated as follows:

35 Utah—30

"The true distinction, therefore, is between the delegation of power to make the law, which necessarily involves a discretion as to what the law shall be, and conferring an authority or discretion as to its execution to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made."

In the case of *United States v. Domingo, supra,* District Judge Beatty, in the course of a well-considered opinion involving this principle, says:

"The solution of the question must in each case be reached by determining whether the rule is an attempt to create a law, or simply a regulation or means of enforcing a law already enacted. If the former, it is void; if the latter, it is as valid as the law itself."

So, in *Locke's Appeal,* 72 Pa. 491, 13 Am. Rep. 716, it is said:

"The true distinction . . . is this: The Legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some facts or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend, which cannot be known to the lawmaking power, and therefore be a subject of inquiry and determination outside of the halls of legislation."

We fully agree with counsel for defendants that the Secretary of the Interior has no authority under his general power of supervision and control of the public domain to lease any part of it, unless authorized to do so by an act of Congress; but the lands in question are not "public lands" in the sense in which that term is generally used and understood. In the case of *United States v. Tygh Valley Land & L. S. Co.* (C. C.), 76 Fed. 693, it is held that "there is a clear distinction between public lands and lands that have been severed from the public domain and reserved from sale or other disposition under general laws. Such reservation severs the land reserved from the mass of public domain and appropriates it to a public use."

(See, also, *Shannon v. U. S.*, 160 Fed. 870.) The purpose of the act under consideration, as expressed in the first section thereof, is "the construction and maintenance of irrigation works for the storage, diversion and development of waters for the reclamation of arid and semiarid lands." The leasing of the lands in question is merely an incident to the main object to be accomplished under the act. It is a matter of common knowledge that when grazing lands of this character are thrown open to the public, and owners of live stock generally are permitted to graze their flocks and herds thereon in unlimited numbers without let or hindrance, the lands soon become overstocked, and conflicting interests of the different flock masters arise, conditions which invariably bring about and cause bitterness leading to strife, and sometimes to bloodshed. Besides, the grass and herbage under these conditions are soon eaten off, and the small trees and underbrush trampled down and destroyed, and the efficiency of the soil for retaining moisture from the rain and snow is thereby very materially impaired, and the water supply in the particular section correspondingly decreased. Now, the very purpose of the act—the thing to be accomplished—is the storage, diversion, and development of water. Therefore, under the general power conferred on the Secretary of the Interior by section 10, we think he was not only authorized, but it also became his duty, on the withdrawal of these lands from public entry, "to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this act into full force and effect." We are clearly of the opinion that the Secretary may, under the general powers conferred on him by section 10, establish rules regulating the use of the lands while not needed for the purpose for which they are reserved, and may limit the number of animals that may be grazed thereon; and that the rule in question was a reasonably proper regulation within the meaning of that section.

Furthermore, the revenue derived from the leasing of

these lands goes into the reclamation fund provided for in the act. This fund, under the act, is "reserved, set aside and appropriated as a special fund" to be used for the very purpose for which the lands are withdrawn from public entry. Therefore, instead of being inconsistent with the act, the leasing of the lands and the results produced thereby are in strict conformity with it. Section 7 of the same act provides: "That where, in carrying out the provisions of this act, it becomes necessary to acquire any rights or property the Secretary of the Interior is hereby authorized to acquire the same for the United States by purchase or by condemnation under judicial process, and to pay from the reclamation fund the sums which may be needed for that purpose."

Now, if the contention of defendants is sound, namely, that there is no authority for the leasing of the lands in question, and that the owners of live stock have the right to pasture their herds thereon at will, it would necessarily follow that they would have the same right to pasture whatever lands the government might acquire by purchase or condemnation proceedings for the purpose of "carrying out the provisions of this act," until such time as the lands are actually used in the project contemplated by the purchase, and that, too, regardless of the injury that might be done the property by the pasturing of live stock thereon. And, as stated by counsel for plaintiffs in his brief: "One could establish a saloon near the works and thereby interfere with the quiet and orderly conduct of the men employed. And one could depasture the lands with sheep and graze amongst the tents and quarters of the employees and officers and in the immediate vicinity of the place where the construction is being done, to the annoyance of, and what would be in effect a nuisance to, those engaged in the work, and necessitate, even in well-grown meadow land, the hauling from long distances of forage for teams employed at the works." In other words, the right of the government to occupy the lands until such time as they are actually utilized in the project

for which they are reserved would be subordinate to that of a mere interloper or trespasser. A mere statement of the proposition is all that is necessary to refute and overturn any argument that can be made in favor of it.

Defendants, in support of their contention that the lands in question were a part of the public domain in 1907, and that the Secretary of the Interior had no authority to authorize the leasing of them, invite our attention to that part of section 3 of the reclamation act which provides that the Secretary is authorized "to withdraw from entry, except under the homestead laws, any public lands believed to be susceptible of irrigation from said works." All that can be claimed for this provision is that parties desiring to homestead lands within the areas withdrawn may do so by complying with the terms and conditions in relation to homestead entries provided for in the act. It does not follow, however, that, because a party may make a homestead entry of not less than forty nor more than one hundred and sixty acres within the areas withdrawn as provided in the act, he is entitled to graze live stock upon the balance of the lands, which, the record shows, is over fifty thousand acres. True, the homesteader in such case would have absolute dominion over the land within his entry, and no rule or regulation of the Secretary of the Interior for the leasing of lands, or otherwise, would give any other party any right whatever to interfere with the homesteader's right of possession. However, the rights of the homesteader are not involved in this case, and we have adverted to the question for the purpose only of showing that defendants' contention on this point is without merit.

The judgment of the court below is affirmed, with costs to respondents.

STRAUP, C. J., and FRICK, J., concur.